## ESTATE OF ANNIE EGAN, DECEASED.
[No. 15,650 (N. S.); June, 1914.]

**Will—Competency of Executor as Witness.**—The executor named in a will is not, by reason of interest, disqualified to act as an attesting witness.

**Will—Competency of Testatrix—Instrument Itself as Indicating.**— A will itself is an evidence which must be considered by the court as establishing the mental integrity of the testatrix.

**Will—Tests of Testamentary Capacity.**—If a testator has sufficient memory and intelligence fairly and rationally to comprehend the effect

of what he is doing, to appreciate his relations to the natural objects of his bounty, and understand the character and effect of the provisions of his will; if he has a reasonable understanding of the nature of the property he wishes to dispose of, and of the persons to whom and the manner in which he wishes to distribute it, and so express himself, his will is good. It is not necessary that he should act without prompting.

**Will—Constituents of Testamentary Capacity.**—The constituents of testamentary capacity are that the testator has an idea of the character and extent of his property, and is capable of considering the persons to whom and the manner and proportion in which he wishes his property to go.

**Will—Capacity of Testatrix Established.**—The testatrix in this case responds to the foregoing conditions. She was competent to make her will and was free from undue influence.

James M. Hanley, for contestants, Eugene P. Egan and others, sons and daughters of decedent.

Emilio Lastreto, for Catherine McCarthy, proponent, daughter.

Timothy J. Crowley, of counsel.

COFFEY, J. In all this class of cases there appears some reason for the institution of a contest, as naturally the kin not favored by the testatrix finds occasion for complaint as to the invidious disposition of the ancestral estate, as in this case, according to counsel for contestants, every circumstance seems to show that the purported will was the handiwork of the daughter Catherine, the proponent.

That is the contention, and certainly there are circumstances that appear to support this conclusion.

It is a case which might justify an appeal to a legislature to abrogate the statute of wills and to deny an ancestor any right of testamentary disposition; but so long as the statute survives courts must be bound by its provisions, and among them is one which allows arbitrarily the ancestor, if of sound mind and free from undue influences, to dispose of property as he may.

The criticisms of counsel for contestants as to the perfunctory manner in which wills are usually executed and attested are justified by the experience of this court. Even attorneys

who are called in as witnesses are as negligent at times and as unmindful of the solemnity of the transaction as "the man on the street" who is asked to act in a capacity for which he may be utterly unqualified. In many cases executors witness instruments in which they are to the extent of their commissions interested, and in this regard, in the opinion of this court, the law should be amended.

Persons nominated in a will as executors are disqualified as witnesses in several states, but in many states they are held competent on the ground that the commissions to which they are entitled do not constitute a benefaction, but are given as compensation for services rendered.

This has been the rule in this state.

It is difficult, however, for the common mind to discern the distinction; but in the process of technical instruction in the law, we find that education forms and informs the common mind so as to distinguish and differentiate between the species of interested persons. An executor, say, is interested to secure an office of profit; the emoluments are sometimes of consequence; frequently the executor derives more from his position than the testamentary heir.

The specific difference between the interest in the emoluments of his trust as executor and the benefaction derived from a bequest which latter would disqualify an attesting witness needs a lawyer's ken to distinguish.

It is ordinarily beyond the reach and ken of a mortal comprehension to understand it.

But we deal with the law as we find it statutorily, and that requires us to ignore the interest of an executor in maintaining an instrument which, if nullified, will deprive him of valuable perquisites.

So with the lawyer, draftsman of the testament, and frequently its attesting witness, and his associate or partner co-witness thereof.

It is difficult, indeed, to manage morally the solution of these problems.

Sometimes a precautious lawyer providently inscribes in the testament that he shall be employed by the executor as the attorney and that he shall receive a liberal fee.

That is not this case, but it is an actual case in the records of this court.

It is common for the testator to direct that the draftsman be employed as attorney and in such case it has been insisted that thereby the attorney has acquired a beneficial interest, but the supreme court has turned down that anomalous attitude of attorney to client: Estate of Ogier, 101 Cal. 381, 40 Am. St. Rep. 61, 35 Pac. 900.

It may be said that these remarks are but dicta and bear no relation to the matters in issue; and that they are irrelevant, incompetent and immaterial; but we shall see, in the course of this controversy, what is meant by this digression.

The will in this case has no symptom of a perfunctory performance. It has every element of professional precision, so elaborate, indeed, in its prophylaxis, as to suggest a suspicion that an attack was apprehended upon its validity.

From the invocation to the attestation every item is apparently safeguarded against assault.

The only challenge, however, to its validity is that at the time of its alleged execution the decedent was not of sound mind.

The will itself is an evidence which must be considered by the court as establishing the mental integrity of the testatrix.

Assuming the veracity of the draftsman and of the subscribing witnesses, of which he is one, the tests of testamentary capacity are: Did the testatrix understand what she was doing; how she was exercising her mental power; what she knew about her property; what disposition she desired to make of it; and whom should be, in the natural order, the beneficiaries of her bounty?

These are the conditions theoretically.

It is in evidence that she was a very careful and frugal woman; kept her own counsel; was extraordinarily thrifty, while not miserly, but she counted the pennies; a woman of sound sense and good judgment; the document was well considered; she was humane, affectionate and considerate for her children, especially provident for her daughters, the sons being capable of caring for themselves.

The principles are so familiar as to the constituents of testamentary capacity that it would seem almost puerile to repeat them, but familiar as they are, it seems of service, from time to time, to recite the catechism to the catechumens. In this respect, as from day to day, we go over our lessons, we are all neophytes. It is a treadmill. As Dickens phrased it, our life "is one demd horrid grind," in the probate forum.

This being said, perfunctorily and perhaps digressively, we return to the rudiments, and repeat the alphabet that "if the testator has sufficient memory and intelligence fairly and rationally to comprehend the effect of what he is doing, to appreciate his relations to the natural objects of his bounty, and understand the character and effect of the provisions of his will; if he has a reasonable understanding of the nature of the property he wishes to dispose of, and of the persons to whom and the manner in which he wishes to distribute it, and so express himself, his will is good. It is not necessary that he should act without prompting": Estate of Ingram, 1 Cof. Prob. Dec. 222.

"The constituents of testamentary capacity are that the testator has an idea of the character and extent of his property, and is capable of considering the persons to whom and the manner and proportion in which he wishes his property to go": Estate of Kershow, 2 Cof. Prob. Dec. 213.

Did the testatrix respond to these conditions? If we are to believe the draftsman and his co-witness, she was responsive to every requisite of normality at the time of attestation.

It seems that the co-witness was an attorney of many years' practice; utterly uninterested in the transaction. There were present only three persons, the draftsman, this witness, and the testatrix, and after some colloquial pleasantries, the ceremony was consummated, and the co-witness was convinced of the capacity of the consummatrix.

The draftsman testified to his part in the matter, which established that he had no other concern than as a reputable attorney called in the course of his vocation to draw the instrument at the instance of a client, the testatrix, and he discharged his duty faithfully, according to her instructions.

Everything was set down at her behest; she dictated each item; gave the reasons therefor; gave the names, ages and status of each child, descriptions of property; metes and bounds; even the macenernyized actions; the contingencies matrimonial of her daughters; all these matters were set forth with particularity and perspicacity. No detail was omitted. All was dictated to the draftsman,

It is said that she had to be reminded of names occasionally, and that she was prompted now and then, but there is nothing significant in this; even Mrs. Gertrude Donovan, née Egan, one of the executrices, not a proponent, but a contestant, says she was present at the time her mother signed the will; it was read aloud in her hearing; she was asked if she had any objection, and she said "no"; but she now contests the instrument.

The husband of this lady thinks that his mother-in-law was not sound in mind, but his reasons are not conclusive; his opportunities were scarcely sufficient to enable him to form an opinion as to her state at the time of the transaction.

Dr. Bluhm, an attending physician and surgeon, thought she was a shrewd and sensible woman; there was no symptom of unsound mind; no impairment of mental faculty; she always spoke well of her children, especially of Gertrude or "Kitty" or Catherine; there was apparently harmony in the household; this witness never suspected that there would be any occasion to question her sanity. Eleven other witnesses, intimate acquaintances, testify to her soundness of mind. A summary of their testimony is as to conversations with her; sensible and humorous; read papers and magazines and books; commented on current events, enjoyed a good story; not a taint of insanity; talked about property matters; was keen on street work, curbing and improvements generally; sound on the main question; went to church on Sundays; rational in speech; always intelligent; no change in thirty years; this is the evidence of neighbors.

Against all of this there is no sufficient evidence on the sole issue, except suggestions that she was not "right"; mere surmises and suspicions which carry no consequence of unsound-

ness of mind. So far as the court can see she was competent
to make this will and it was free from any element of undue
influence, although that is not an issue.

Opposition overruled. Will admitted to probate.